# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **ERIC S. BLOCK,**<br>**10811 Seven Oaks Court**<br>**Spotsylvania, VA 22553**<br><br>     **Plaintiff,**<br><br>          **v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>**Serve:**<br>**Muriel Bowser, Mayor,**<br>**1350 Pennsylvania Avenue, NW,**<br>**Washington, DC 20004**<br><br>**Serve:**<br>**Attorney General Brian Schwalb**<br>**400 6th Street, NW**<br>**Washington, DC 20001**<br><br>**And**<br><br>**DISTRICT OF COLUMBIA OFFICE**<br>**OF THE STATE SUPERINTENDENT**<br>**OF EDUCATION,**<br><br>**Serve:**<br>**Antoinette S. Mitchell, Superintendent,**<br>**1050 First Street, NE,**<br>**Washington, DC 20002**<br><br>     **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Civil Action No. 26-cv-01741** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Eric S. Block, by and through undersigned counsel, brings this civil action against

Defendant District of Columbia, by and through the D.C. Office of the State Superintendent of

Education ("OSSE", "DC", or "Defendant"), and alleges as follows:

1

## NATURE OF THE CASE

1. This is an action for disability discrimination, failure to accommodate, and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., as amended, ("ADA"), and the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 et seq. ("DCHRA").

2. Defendant failed to provide Plaintiff with a reasonable accommodation for his known disability, despite repeated requests and the availability of a simple, effective accommodation.

3. Instead, Defendant provided an ineffective and unsafe alternative, ignored Plaintiff's repeated complaints regarding the ineffective accommodation, and delayed corrective action, resulting in severe physical injury and significant damages.

4. Defendant further subjected Plaintiff to retaliatory and discriminatory harassment, including, but not limited to, a negative performance evaluation accusing Plaintiff of dishonesty in the performance of his duties.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's DCHRA claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful employment practices occurred in the District of Columbia.

## PARTIES

7. Plaintiff Eric Block was an employee of OSSE during the time period relevant to this complaint. Mr. Block was in the position of Lead Investigator. Mr. Block began his

employment with the District of Columbia on January 26, 2015, and began working at OSSE on July 22, 2018. Mr. Block was promoted to his position as Lead Investigator on October 9, 2022.

8.      Defendant, by and through OSSE, is an employer within the meaning of the ADA and DCHRA.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.      Plaintiff has exhausted all administrative prerequisites to filing this action.

10.      On numerous occasions in September 2025, Plaintiff, through counsel, attempted to participate in EEO counseling via at least three different EEO counselors for the Defendant. After no EEO counselor was willing to conduct EEO counseling for the Plaintiff, the Plaintiff, upon the direction of the Defendant's Office of Human Rights ("OHR") filed a formal EEO complaint with the Defendant.

11.      Specifically, on October 3, 2025, Plaintiff, through counsel, filed an EEO complaint with the Defendant.

12.      On November 12, 2025, Plaintiff participated in an intake call with Ms. Jessica Trejo, a Human Rights Officer within the OHR.

13.      On December 22, 2025, Plaintiff, through counsel, submitted an amendment to his pending EEO complaint. The notice of amendment was sent to Human Rights Officer Trejo and alleged retaliation by the Defendant in connection retaliatory harassment and a retaliatory performance appraisal, which contained false allegations that the Plaintiff engaged in dishonest investigative practices.

14.      On February 24, 2026, Plaintiff, through counsel, signed the final charge of discrimination as approved for processing by the Defendant. The claims included the failure to

accommodate claim and the retaliatory performance appraisal, but excluded, over the Plaintiff's repeated objections, the allegations of discriminatory and retaliatory harassment.

15. On March 3, 2026, Plaintiff, through counsel filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission in relation to the Plaintiff's allegations of discriminatory and retaliatory harassment.

16. On or about March 3, 2026, the Defendant transferred the Plaintiff's EEO complaint with the Defendant's Office of Human Rights to the U.S. EEOC for investigation.

17. On May 18, 2026, the U.S. EEOC issued Plaintiff the Notice of Right to Sue in regard to his complaints of discrimination and retaliation.

18. Plaintiff also put the Defendant on notice of his claim, including his claim for liquidated and unliquidated damages, via letter to the Mayor on November 10, 2025.

## FACTS

19. Plaintiff suffers from spinal (back and neck) conditions that substantially limit major life activities, including standing, sitting, and bending.

20. Plaintiff was able to successfully perform the essential functions and duties of his position as Lead Investigator, including without accommodation at times and with accommodation as needed.

21. From July 2024 through March 2025, Plaintiff underwent two lumbar surgeries and one cervical surgery. Following each surgery, Plaintiff recovered sufficiently to return to in-person work.

22. Plaintiff did not require accommodation when returning to in-person work prior to May 2025 because prior to May 2025 the Plaintiff had a functioning adjustable desk that allowed him to adjust his posture as needed.

23. By May 2025, Plaintiff was recovering well from his March 2025 back surgery and was able to return to in-person work.

24. On May 6, 2025, after returning to work, Plaintiff informed his supervisor, Ms. Toni Lemons, that his adjustable desk was broken. All employees who work in the same building as Plaintiff had adjustable desks.

25. Plaintiff further explained to Ms. Lemons that the adjustable desk was medically necessary to allow him to adjust his posture and positioning to ensure that he did not cause stress or pressure on his back, neck and spine.

26. Ms. Lemons advised Plaintiff to speak with employees within Building Operations, Alicia Denmark and Terrell Bryant, regarding his broken workstation.

27. On May 8, 2025, Plaintiff messaged Ms. Lemons to notify her that Building Operations had confirmed that his desk was broken and he reiterated his need to be able to adjust his sitting position. Ms. Lemons responded that the Defendant could not purchase a working desk for Plaintiff "unless it was required like an ADA accommodation, then we may have to."

28. Later on May 8, 2025, Plaintiff met with Ms. Lemons and Ms. Lemons told Plaintiff that in order to receive a functioning adjustable desk that he would need a doctor's note.

29. On May 19, 2025, Plaintiff visited with his medical provider, who confirmed that Plaintiff was recovering well. The medical provider also gave Plaintiff a letter confirming Plaintiff's need for accommodation in the form of a workstation that would allow him to adjust his positioning and posture.

30. On May 20, 2025, Plaintiff provided the doctor's note to his supervisor, Ms. Lemons. Plaintiff also sent a copy of the doctor's note to Ms. Lemons and Mr. Jake Arnott via email.

31.     Mr. Jake Arnott, a Supervisory HR Specialist, Leave Programs Manager and ADA Coordinator within OSSE, was involved in handling Plaintiff's reasonable accommodation request.

32.     Defendant was aware of Plaintiff's disability and need for accommodation. The Defendant was also aware of available working spaces that had fully functioning adjustable desks that could have accommodated the Plaintiff.

33.     On May 20, 2025, Ms. Lemons informed Plaintiff that someone should be coming to switch out his desk.

34.     On or about May 20, 2025, Mr. Arnott notified Plaintiff that he had a solution to Plaintiff's accommodation request.

35.     Instead of providing the Plaintiff with a functioning adjustable desk, Defendant provided Plaintiff with a heavy desk riser that was incompatible with his workstation. The desk riser required lifting and repositioning, which was plainly and obviously unsafe given Plaintiff's condition.

36.     On or about May 20, 2025, the Defendant delivered the desk riser to the Plaintiff's workstation.

37.     Upon delivery of the desk riser by the Defendant's Program Support Specialist, Mr. Terrell Bryant, Mr. Bryant observed that it took two individuals to lift the desk riser onto Plaintiff's workstation. Mr. Bryant was unable to lift it without assistance. Mr. Bryant commented that the desk riser was not going to work.

38.     The desk riser did not enable the Plaintiff to adjust his sitting position, and it could not be used while the Plaintiff was sitting.

39.     Rather, it only permitted him to work standing up, thereby requiring Plaintiff to repeatedly lift the heavy desk riser on and off his desk in order to be able to switch between standing and sitting.

40.     The desk riser did not fit properly on Plaintiff's workstation due to its size. It hung over the edge of the workstation and pushed Plaintiff 1-2 feet away from his workstation. The desk riser also prevented Plaintiff from being able to reach supplies on his desk, including his phone.

41.     Additionally, the desk riser blocked the monitors on Plaintiff's workstation, preventing Plaintiff from using his desk's monitors effectively when using the desk riser. To view his monitors while using the desk riser while standing, the Plaintiff had to bend down to see the monitor screens, thereby negatively impacting his posture.

42.     The use of the ineffective desk riser forced Plaintiff into uncomfortable and harmful postures, causing repetitive pain and strain on Plaintiff's neck and back.

43.     Plaintiff notified Mr. Arnott the same day that the desk riser was delivered that he was not able to pick the desk riser up safely because it was too heavy and that he thought it may hurt his back to have to pick it up and down to use. Further, Plaintiff informed them that the desk riser did not work for the Plaintiff's workstation due to its size.

44.     Plaintiff repeatedly notified Mr. Arnott from on or about May 20, 2025 through June 25, 2025, that the riser was ineffective. Plaintiff disclosed to Mr. Arnott on numerous occasions during this time period that his desk was still broken, that the desk riser did not allow him to adjust his posture and was causing him pain.

45.     Plaintiff advised Mr. Arnott to come to his workstation to see the desk riser in person but Mr. Arnott declined to do so.

46.   On June 24, 2025, Mr. Arnott expressed surprise that Plaintiff's desk was still broken and that it had not been fixed yet and advised Plaintiff that he would look into it.

47.   Defendant was aware the riser was neither a safe nor an effective accommodation for Plaintiff.

48.   On June 24, 2025, Mr. Arnott informed Plaintiff that he was processing the Plaintiff's request as an ADA accommodation and requested the Plaintiff's cubicle number. Mr. Arnott also asked Plaintiff to provide him with a written explanation of the issues Plaintiff was having with the desk riser. Plaintiff responded in writing on June 24 and June 25 confirming the same information he had shared with Mr. Arnott in person on numerous prior occasions.

49.   On June 25, 2025, Mr. Arnott apologized to the Plaintiff for the accommodation process taking so long.

50.   Plaintiff suffered injuries to his neck and back as a direct result of not having an adjustable desk or workspace permitting him to maintain a proper posture and to alternate between standing and sitting without straining his back and neck.

51.   On July 1, 2025, Plaintiff was forced to take medical leave due to debilitating pain.

52.   On July 14, 2024, Plaintiff had a doctor's appointment and his doctor recommended that he work from home to remove him from the dangerous working environment, enable assessment of his injuries and to develop a treatment plan.

53.   Defendant failed to take corrective action to provide the Plaintiff with effective accommodation until July 16, 2025, which was after the Plaintiff had been injured and forced to work remotely due to the Defendant's failure to accommodate him.

54.   The delay caused significant and preventable injuries.

55.    As a result of the Defendant's failure to accommodate the Plaintiff, Plaintiff suffered severe physical pain and injury, including additional lumbar injuries.

56.    Beginning in late May 2025, the Plaintiff began to experience progressively worse discomfort and pain as a result of his inability to maintain good posture and to adjust his position while working.

57.    On June 27, 2025, the Plaintiff's pain escalated to the point where he needed to seek medical care. Plaintiff was experiencing severe pain in his neck, back and shoulders, including, but not limited to, pain that radiated into his arms, numbness and tingling in his hands, severe pain in his lower back, and a burning sensation radiating into his groin.

58.    The Plaintiff had difficulty sleeping, was unable to lay flat on his back, and had difficulty moving, including standing, sitting, walking, and stretching.

59.    According to the Plaintiff's board-certified Neurosurgeon, Plaintiff suffered a new disc herniation and nerve damage as a result of not being able to maintain good posture while working.

60.    As a result of the injuries and pain Plaintiff suffered due to the Defendant's failure to accommodate him, Plaintiff underwent multiple trigger point injections in his spine, a lumbar injection, a cervical injection, two invasive lumbar surgeries, and ongoing medical treatment and rehabilitation.

61.    While some of the Plaintiff's injuries were treated via surgery, others require ongoing care, including continuing injection shots to manage ongoing pain and discomfort.

62.    Plaintiff has also suffered emotional distress, anxiety, irritability, loss of enjoyment of life, and loss of dignity as a result of the Defendant's failure to accommodate him.

63.    Plaintiff filed a workers' compensation claim due to his workplace injury.

64.    The Defendant, through the Defendant's Office of Resolution Management ("ORM") failed to conduct a meaningful investigation of Plaintiff's claim, to include failing to conduct any medical examination of the Plaintiff, prior to denying his claim without justification and without identifying what, if anything, caused the injury outside of the workspace.

65.    Instead, the Defendant took steps to defend itself from liability for its failure to accommodate the Plaintiff. Notably, the record in that matter revealed that shortly after Plaintiff submitted his workers' compensation claim, Ms. Lemons, Mr. Arnott, ORM and the Defendant's legal teams began collaborating to ensure that any information released about the claim was properly vetted and cleared by legal before release and that everyone was aligned. The investigative file reveals that the Defendant anticipated needing the OSSE and ORM legal teams to collaborate as the matter was "straddling into an HR EEO or Disability rights matter" and "protection of [their] joint process is key and [sic] protect both agencies."

66.    Plaintiff's supervisory chain referred to Plaintiff's request for a working adjustable desk as seeking a "luxury" and not a necessity, despite his verified need for accommodation.

67.    Only after Plaintiff reported his injuries due to the failure to accommodate him, the Defendant fixed his desk.

68.    Defendant further subjected Plaintiff to harassment and retaliation, including a negative performance evaluation accusing Plaintiff of dishonest behavior.

69.    This conduct was in response to Plaintiff's requests for accommodation and protected activity.

70.    On November 25, 2025, Ms. Lemons issued Plaintiff a performance review that falsely alleged that Plaintiff had engaged in dishonest investigative practices, including falsely claiming that Plaintiff "utilized investigative skills that are not always truthful in nature",

suggesting Plaintiff had not ensured integrity and honesty in the investigative process, accusing Plaintiff of using tactics that would require being untruthful, and explicitly alleging that the Plaintiff lied. As an Investigator, accusations of dishonesty, lying and/or lack of integrity severely damage Plaintiff's reputation.

71.    Plaintiff requested clarification from Ms. Lemons as to what she was referring to in the defamatory allegations but Ms. Lemons refused to identify any instances in which Plaintiff has engaged in dishonest behavior.

72.    Notably, on May 8, 2025, Ms. Lemons issued Plaintiff a mid-cycle performance review that did not make any mention of dishonest practices and, to the contrary, noted that Plaintiff provided other investigators constructive feedback on their interviewing skills.

73.    Ms. Lemons also subjected Plaintiff to harassment beginning on or about September 29, 2025, by directing Plaintiff to call in daily to request sick leave while Plaintiff's FMLA leave request was pending, including directing Plaintiff to call out while he was hospitalized for surgery, despite not requiring the same when Plaintiff was out for medical leave related to prior surgeries that were not related to the Defendant's failure to accommodate.

74.    Ms. Lemons further subjected Plaintiff to harassment by directing Plaintiff to provide detail reports of every task undertaken during the day while Plaintiff was working remotely from on or about July 15, 2025 through on or about February 20, 2026.  Plaintiff was not subjected to this onerous requirement during past periods in which Plaintiff worked remotely while recovering from injuries and surgeries that were not caused by the Defendant's failure to accommodate him.

75.    Plaintiff has suffered severe mental, emotional and physical harm as a result of the Defendant's discriminatory and retaliatory actions.

## COUNT I – FAILURE TO ACCOMMODATE (DCHRA)

76.   Plaintiff incorporates the preceding paragraphs.

77.   Plaintiff is a qualified individual with a disability under the DCHRA.

78.   Defendant was aware of Plaintiff's disability and need for accommodation.

79.   Plaintiff requested a reasonable accommodation.

80.   Defendant failed to provide a timely and effective accommodation.

81.   Defendant failed to engage in the interactive process in good faith.

82.   As a result of Defendant's failure to provide a timely and effective accommodation, the Plaintiff suffered significant damages.

83.   Defendant's conduct caused Plaintiff severe harm, including but not limited to severe pain and physical injuries, and required significant medical treatment, including but not limited to invasive surgeries.

## COUNT II – FAILURE TO ACCOMMODATE (ADA)

84.   Plaintiff incorporates the preceding paragraphs.

85.   Plaintiff is a qualified individual with a disability under the ADA.

86.   Defendant had notice of Plaintiff's disability and need for accommodation.

87.   Plaintiff requested a reasonable accommodation.

88.   Defendant failed to provide a timely and effective accommodation.

89.   Defendant failed to engage in the interactive process in good faith.

90.   As a result of Defendant's failure to provide a timely and effective accommodation, the Plaintiff suffered significant damages.

12

91.     Defendant's conduct caused Plaintiff severe harm, including but not limited to severe pain and physical injuries, and required significant medical treatment, including but not limited to invasive surgeries.

## COUNT III – DISCRIMINATORY AND RETALIATORY HARASSMENT (ADA)

92.     Plaintiff incorporates the preceding paragraphs.

93.     Plaintiff engaged in protected activity, including requesting accommodation and filing an EEO complaint.

94.     Defendant subjected Plaintiff to adverse retaliatory actions, including harassment and a negative performance evaluation accusing him of dishonesty.

95.     The conduct was severe enough to alter the conditions of Plaintiff's employment and was the type that would discourage a reasonable person from asserting their rights under the ADA.

96.     There is a causal connection between Plaintiff's protected activity and Defendant's conduct.

97.     Defendant's harassing conduct caused Plaintiff to suffer mental and emotional harm.

## COUNT IV – DISCRIMINATORY AND RETALIATORY HARASSMENT (DCHRA)

98.     Plaintiff incorporates the preceding paragraphs.

99.     Plaintiff engaged in protected activity, including requesting accommodation and filing an EEO complaint.

100.     Defendant subjected Plaintiff to adverse retaliatory actions, including harassment and a negative performance evaluation accusing him of dishonesty.

101.    The conduct was severe enough to alter the conditions of Plaintiff's employment and was the type that would discourage a reasonable person from asserting their rights under the DHRA.

102.    There is a causal connection between Plaintiff's protected activity and Defendant's conduct.

103.    Defendant's harassing conduct caused Plaintiff to suffer mental and emotional harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff;

B. Award compensatory damages for economic, physical, emotional and mental harms in an amount to be proven;

C. Award all pre-judgment interest allowed by law;

D. Award all other equitable relief as appropriate;

E. Award reasonable attorneys' fees and costs;

F. Grant such other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

_/s/ Matthew Estes_
Matthew Estes (DC Bar No. 989814)
The Law Firm of Matthew D. Estes, P.L.L.C.
1717 K Street, NW, Suite 900
Washington, DC 20006
Tel. (202) 753-5079
Matthew@AttorneyEstes.com

Dated: May 21, 206